**Jonathan Gersten**, OSB #191582
**Juan C. Chavez**, OSB #136428
**Franz Bruggemeier**, OSB #163533
**Alex Meggitt**, OSB #174131
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| PHILIP CHACHKA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PORTLAND, and JOHN DOES 1-10,<br><br>Defendants. | Case No. 3:22-cv-01141<br><br>COMPLAINT<br><br>Civil Rights Action (42 U.S.C. § 1983)<br><br>JURY TRIAL DEMANDED |

On August 5, 2020, Mr. Philip Chachka, Plaintiff, was protesting the killing of Black people by United States police departments, including the Portland Police Bureau. He files this suit because the Defendants unlawfully hit him twice with a baton. A Portland Police Bureau officer, Defendant John Doe 1, hit Mr. Chachka in his back with a baton, breaking the umbrella Mr. Chachka used to protect himself against Portland Police Bureau-deployed munitions. The same officer then sought out Mr. Chachka as he was running away from Portland Police Bureau officers and struck him on the neck with his baton. The strikes caused pain to Mr. Chachka's

back and neck, which then required pain management and a visit to the doctor. Mr. Chachka was not facing the officer at or during the strikes, as he was running the opposite direction as ordered by the Portland Police Bureau. Mr. Chachka posed no threat to the officer and complied with dispersal orders. The officer did not attempt to arrest Mr. Chachka and did not take him into custody after hitting him. This is in keeping a pattern and practice of the City of Portland and John Doe, Defendants, of unlawfully punishing groups that express sentiments in support of police accountability or against white supremacy.

## JURISDICTION

1. This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1343(a)(3), (4).

## VENUE

2. Venue is proper within the District of Oregon because all of the events giving rise to this claim occurred in this judicial district, and all defendants reside in this judicial district. 28 U.S.C. § 1391(b). The acts and practices alleged herein occurred in Portland, Multnomah County, Oregon.

## PARTIES

3. Philip Chachka, Plaintiff, is a citizen of the State of Oregon.

4. Defendant City of Portland (hereinafter, "City") is a political subdivision of the State of Oregon with the capacity to sue and be sued. The City runs the Portland Police Bureau (hereinafter, "PPB").

5. Plaintiff does not know the name of Defendant John Doe, and thus sues them under a fictitious name. John Doe is a Portland Police Officer who under color of law hit and injured Plaintiff. They are sued in their individual capacity.

6.	Plaintiff does not know the names of Defendants John Does 2-10, and thus sues them under fictitious names. John Does 2-10 are any City employees who exercised command responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in Plaintiff's deprivation of civil rights as hereinafter alleged, or furthered the pattern and practice of unconstitutional conduct hereinafter alleged. They are sued in their individual capacities.

## FACTUAL ALLEGATIONS

### I. Introduction: Black Lives Matter.

7.	The disproportionate and excessive use of force against Black people by police officers in the United States is a well-documented, systemic problem. It exists in every police department in this country, including the PPB.

8.	For many years, advocates and activists have attempted, largely unsuccessfully, to get the City to address and reduce the Portland Police Bureau's disproportionate use of force, stops, searches, seizures, and arrests of Black people, Indigenous people, and people of color. Efforts to address the Portland Police Bureau's racial profiling dates back to the 1990s.[1] And yet, despite all the recommendations, implemented or more often, not, PPB continues to engage in disproportionate targeting of Black people in stops, searches, seizures, and uses of force.

9.	On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr. Floyd's neck while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not

---

[1] https://www.portlandoregon.gov/police/article/32381

breathe. A bystander video of the murder quickly went viral, sparking outrage throughout the country.

10.     For many Americans, and particularly Black Americans, the murder of George Floyd, in broad daylight while being openly filmed by a witness, was the proverbial straw that broke the camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" by their political and law enforcement leaders, millions of Americans took to the streets in protest, demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

11.     Protests against police violence have been met with police violence in nearly every city around the country. Videos shared in the press and on social media show the police in this country out of control: attacking journalists, attacking bystanders, threatening children, assaulting people for insulting them, engaging in drive-by attacks with "less lethal" weapons, planting weapons in the hands of people arrested, pulling off demonstrators' CDC-recommended facemasks and macing them, kettling whole groups of protesters only to launch tear gas at them, driving their cars directly through crowds of people, using military helicopters in efforts to terrify civilians, discussing plans to shoot protesters, and above all, using massive amounts of tear gas and impact weapons in a systemic effort to stop people from protesting police violence. This violent police response has only strengthened the resolve of protesters.

12.     Beginning on May 29, 2020, Portlanders have been demonstrating in the streets demanding justice for George Floyd and demanding an end to police violence. The PPB, like police departments throughout the country, have met these demands with violence.

13.     On June 23, 2021, Mayor Ted Wheeler, who in addition to being the chief executive for the City of Portland is also the PPB's commissioner-in-charge, articulated this policy succinctly as wanting protesters to "hurt."[2]

## II. PPB and Impact Munitions

14.     PPB uses two different platforms for launching "riot" control munitions: an 18 mm, 15-round capacity, shoulder fired weapon called an FN303; and 40 mm, two round capacity, shotgun-style launcher. PPB uses the FN303 to deploy munitions containing OC powder designed to cause chemical irritation to anyone around the impact; munitions containing paint designed to both hurt the person and mark them with paint; and munitions containing sand to both hurt the target and cause non-chemical irritation. PPB uses the 40 mm launcher to fire foam tipped rounds designed to hurt people, foam tipped rounds with OC inside, and two types of "flash-bang" grenades: one that emits light and sound, and one that, in addition, spreads plastic shot over an area of people in order to hurt them.

15.     Neither the FN303s nor the 40 mm launchers are accurate at long distances and become inaccurate altogether after several deployments. The use of FN303s and 40 mm launchers in crowd management settings has led to the death of protesters, like in Boston.[3] This fact has led to some police departments to cease use of FN303s altogether, like the Boston Police Department, which repurposed these weapons by melting them into sewer caps.[4]

---

[2] Aaron Mesh, *Portland Mayor Wants Reed College to Expel Student If He's Convicted of Smashing Downtown Windows*, Willamette Week (April 23, 2021), https://www.wweek.com/news/city/2021/04/23/portland-mayor-wants-reed-college-to-expel-student-if-hes-convicted-of-smashing-downtown-windows/
[3] The New York Times, *Boston Police to Destroy Pepper-Spray Guns* (Feb. 23, 2007), available at https://www.nytimes.com/2007/02/23/us/23pepper.html
[4] *Id*.

16.     In the past and during the present protests, from May 31, 2020 and onwards, law enforcement has fired these impact munitions indiscriminately into crowds of passively resisting, or other peaceful protesters, both before and after PPB has declared an unlawful assembly/civil disturbance, leaving large welts, bruises, and other similar injuries. Protesters outside in Portland have attested to being fired upon and hit by such munitions by law enforcement standing at the top of the stairs across the street despite having not engaged in any behavior that was criminal, let alone threated anyone's life or safety.

### III. PPB's Pattern and Practice of Targeting Police Accountability Protesters

17.     On several occasions since 2017, demonstrations in support of police and against the Black Lives Matter movement have occurred in Portland. During these demonstrations, Defendants did not use tear gas, impact munitions, nor any force against these protestors. Instead, PPB provided escorts to maintain the safety and security of these protestors, an accommodation not afforded to those protesting police violence. For example, on August 17, 2019, a group of approximately 500 pro-fascist, pro-police, anti-Black activists from across the country held an unpermitted rally in Tom McCall Waterfront Park in downtown Portland. The stated aim of the rally organizers was to waste city funds and resources. PPB made extensive accommodations for the rally, including closing the Hawthorne Bridge to traffic, erecting concrete barriers around the site of the rally, and placing a heavily armed police presence between the fascist rally and counter protesters. After the far-right rally in Tom McCall Waterfront Park, PPB opened the Hawthorne Bridge for the exclusive use of the fascist rally. PPB declared a civil disturbance after the far-right rally dispersed, ultimately arresting 13 counter protesters. The organizers of the fascist event announced they would return to Portland each month to continue to waste city resources.

18.     Likewise, on August 22, 2020, many anti-Black Lives Matter protestors descended on Portland, armed with paintball guns, metal rods, aluminum bats, fireworks, pepper-spray, rifles and handguns in an attempt to intimidate and rally against Black Lives Matter protestors. Defendants did not intervene or arrest these pro-police demonstrators for posing threats to Portland community members. Tusitala "Tiny" Toese, who had an outstanding warrant for his arrest, was present, seen, and identified by Defendants, but not arrested. In contrast, PPB members arrested Demetria Hester, a Black Lives Matter leader, less than two weeks prior.

19.     Similarly, on September 26, 2020, a group of approximately 200 pro-fascist, pro-police, anti-Black activists descended on Delta Park for a rally for the express purpose of provoking a violent confrontation with anti-fascist activists. They open-carried firearms within the park, in violation of city code, set up armed check points to control access to the park, and forcibly removed people they decided were not there to support their fascist cause. At least one individual was jumped and given a concussion by the violent mob. At one point, a vehicle arrived and delivered dozens of homemade shields. Despite the presence of dozens of police officers, including PPB "liaison officers" on foot in the park, defendants did not intervene in any way with this criminal activity. On the same day, at the same time, anti-fascist organizers held a rally three miles away in Peninsula Park. That rally was specifically designed to avoid violent confrontations with the fascist rally. No march was planned. Nevertheless, there was a heavy police presence from PPB, and PPB seized homemade shields from participants and arrested individual participants.

### IV. PPB's Pattern and Practice of Illegal Use of Force at Protests

20.     PPB has a policy or practice of using force without individualized justification to disperse protestors. From May 30, 2020 and onwards, PPB regularly used force consistent with this

policy and practice against people like Plaintiff, *i.e.*, without individualized justification to use force. This policy and practice existed to punish people like Plaintiff who wanted to call attention to PPB's rampant lawlessness and violence against the public.

21.     Former PPB Chief Jamie Resch stated in a news conference on June 3, 2020 that the decision to use tear gas, other riot control, and "less lethal" weapons against a crowd of protesters the evening prior was made by incident commanders, such as John Does 2-10, at the scene.

22.     Nearly a year after protests began, PPB has failed to accurately document or evaluate its officers' use of force against protesters. PPB, including John Does 1-10, has demonstrated that it does not take criticisms of its use of force seriously, and it is unwilling or unable to honestly assess, much less ameliorate, its pattern and practice of unconstitutional use of force against protesters without outside orders or supervision.

23.     In an evaluation of PPB's after-action reports (AARs) and other Bureau documentation reviewing and assessing its response to protests between May 29 to November 15, 2020, the attorneys in the U.S. Department of Justice Civil Rights Division ("USDOJ") stated that "PPB's self-assessment insufficiently analyzes its management of force, its members' justifications for force, and the organization's plan to enforce compliance with policy and training. Instead, PPB focuses primarily on external factors beyond its control while over-relying on training and software to address the few faults it is willing to own."

24.     PPB broadly portrays all force as justified and evaluated itself as doing an *excellent* job handling the nightly protest.

25.     PPB has a pattern of misusing the phrase "active aggression" to justify force against individuals who engaged in passive resistance or merely failed to disperse.

26. PPB did not track an inventory of munitions or make a daily count of the type and amount of force used against individuals for most of the summer of 2020.

27. PPB did not assess whether officers violated PPB policies related to using force, reporting force, and reviewing force reports. In its evaluation of use of force at protests, PPB supervisors focus on the articulation of members' justifications for using force, rather than whether a particular use of force was justified.

28. PPB has failed to issue use of force warnings to individuals, or confirm that subjects heard use of force warnings, before using force on protesters.

29. The PPB supervisors assigned to complete AARs had little to no crowd management training.

30. PPB has failed to hold officers, supervisors, and executives accountable for using or approving force without sufficiently articulating a permissible justification.

31. PPB scheduled a Rapid Response Team (RRT) training for April, 2021, and only created lesson plans for parts of the training after DOJ requested copies. PPB ended up cancelling this training because the materials and outlines were insufficient to meet the DOJ's required standards.

32. PPB treated the failure to disperse as sufficient justification, in and of itself, to use force against protesters. PPB did not engage in individualized assessments of the reasonableness of a particular use of force against a particular person, as required by their PPB Directive 1010. Instead, the officers on the ground and their supervising officers believed that a mere failure to disperse, which is only passive resistance, was sufficient to justify the use of indiscriminate force. This unconstitutional policy is justified, in part, by a different directive, PPB Directive 635.10.

33. Ultimately, almost one year after the death of George Floyd, Defendant has failed to acknowledge "the importance of PPB members complying with constitutional standards, adhering to approved policies, and enforcing policy violations." Since May 31, 2020, the City has increased its inventory of crowd control weaponry for use against demonstrators.

## V. Court Orders and Contempt

34. As a result of PPB's lawless uses of force against protesters, Federal and State Courts in Oregon have used their remedial powers to restrain PPB's excesses.

35. The case *Don't Shoot Portland, et al v. City of Portland*, Or. Dist. Case No. 3:20-cv-00917-HZ, was filed on June 6, 2020 directly in response to the opening days of mass police violence in the wake of George Floyd's murder. The Plaintiffs sought and received an injunction placing limits on police use of force at protests shortly after filing their case. The Court later found that PPB's conduct on June 30, 2020 violated the Court's order—specifically owing to the use of impact munitions shot at protesters who were not actively aggressive.

36. Through the *Don't Shoot* litigation, the public learned that PPB had trained their riot police with incorrect use of force standards, such as with citations to opinion overruled in *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) and with incorrect descriptions of protesters walking slowly as "actively aggressive." One training concluded with a slide that caricatured police accountability protesters and advocated for violence against them.



37.  The case *Index Newspapers LLC, et al v. US Marshals Serv., US DHS, and City of Portland*, Or. Dist. Court Case 3:20-cv-01035-SI was filed on June 28, 2020. The Plaintiffs were non-protesters who were passively observing protests—members of the media, legal observers—who were nonetheless targeted for injury and/or dispersal by PPB. The Court enjoined PPB from this practice.

38.  The case *ACLU & Protestor #1 v. City of Portland*, Mult. Co. Cir. Case No. 20CV27116 was filed in July 2020 after it became apparent PPB had been violating ORS 181A.250. That Oregon law prevents law enforcement from surveilling people because of their political activities. The State court enjoined PPB from this practice in September 2020.

39.  As partly discussed above, the United States Department of Justice has maintained a quasi-consent decree against the Portland Police Bureau because of its pattern and practice of using excessive force against people with mental illness. *United States v. City of Portland*, Or. Dist. Case No. 3:12-cv-02265-SI. As part of its obligations under the settlement agreement the City had entered into with the USDOJ, PPB had to maintain records regarding its use of force and comply with the U.S. Constitution. The USDOJ found PPB in violation with the settlement

agreement owing to its actions in 2020 and has sought remedial sanctions against the City of Portland.

40. As described in the preceding paragraphs, numerous courts have found that PPB has violated the law on multiple occasions—acutely so in the summer of 2020, when they injured Plaintiff.

### VI. August 5, 2020

41. On August 5, 2020, Plaintiff attended a gathering in Southeast Portland to protest police killings of Black Americans and police violence. Plaintiff had been occasionally, passively protesting throughout the summer despite having witnessed PPB use mass violence to squelch his speech rights.

42. At approximately 10:00pm, PPB declared the gathering a riot via its Long Range Acoustic Device ("LRAD"). Shortly thereafter, PPB demanded that the crowd disperse north on SE 112th Ave. and subsequently east on SE Stark Street, along the sidewalk.

43. The sidewalk could not contain all the people asked to disperse, and people congested the sidewalk. The sidewalk also contained hazards including poles, fire hydrants, and debris from the dispersing crowd.

44. Shortly after PPB gave dispersal orders, a line of PPB officers rushed the crowd toward the East along Stark Street, wielding batons and filling the width of the street. PPB also deployed munitions and tear gas.

45. Plaintiff used his red umbrella as a shield against the munitions as he walked briskly east, away from the police as ordered. As Plaintiff moved east, John Doe 1 hit Plaintiff in his lower back, breaking Plaintiff's umbrella in the process. Plaintiff stumbled but continued moving east.

46. As Plaintiff moved east, John Doe 1 ran toward Plaintiff, lunged toward him with both hands wielding a baton, and struck Plaintiff on the right side of his neck. Plaintiff was not facing the officer at the time of either strike.

47. After the attack, the officer ran back to his previously maintained place in the line of PPB officers. No officer, including John Doe 1, attempted to arrest Plaintiff nor take him into custody. Plaintiff had not been committing a crime, nor exhibiting signed of "actively aggressive." He posed no threat to the officer. To the best of his knowledge, no one around him had been actively aggressive, nor had anyone in his group been targeted for arrest following this hit. By information and belief, John Doe 1 hit Plaintiff in retaliation for protesting police that evening.

48. The multiple hits by John Doe 1 caused Plaintiff's neck and back to suffer stiffness and soreness. Plaintiff took over-the-counter pain management medication for several days, before seeing a doctor on August 10, 2020. Furthermore, he did not attend another protest for over a week due to the pain and trauma from that night.

### Claim 1: Fourth Amendment – Unlawful Seizure – Individual Liability
### (42 U.S.C. § 1983)

49. It is clearly established law that an officer may not use force that, in light of the circumstances and as perceivable by a reasonable, objective officer, is excessive and unnecessary.

50. In taking the actions described above, including but not limited to hitting an unarmed person running away from Defendants, Defendant John Doe 1 intentionally violated Plaintiff's right to be free from unlawful seizures guaranteed by the Fourth Amendment to the United States Constitution.

51. Defendant John Doe 1 violated rights held by Plaintiff which were clearly established, and no reasonable official similarly situated to John Doe 1 could have believed that his or her

conduct was lawful or within the bounds of reasonable discretion. Defendant John Doe 1 therefore does not have qualified or statutory immunity from suit or liability.

52.     The actions of Defendant John Doe 1, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendant John Doe 1, in their individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

53.     John Does 2-10 participated in Plaintiff's injury by failing to train, supervise, and discipline John Doe 1, and/or by directing John Doe 1 to strike Plaintiff. Their direct participation in the injury caused Plaintiff's rights to be injured.

54.     The unreasonable seizure of Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and injuries to his neck and back. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

### Claim 2: Fourth Amendment – Unlawful Pattern and Practice – Municipal Liability (42 U.S.C. § 1983)

55.     As described in Claim 1, Defendant John Doe 1-10 violated Plaintiff constitutional right to be free from unlawful seizures.

56.     Defendant John Doe 1-10 conduct is illustrative of a pattern and practice of PPB officers violating the Fourth Amendment rights individuals at protest demonstrations countering white supremacist groups and/or police misconduct.

57.     Defendant City of Portland does not have adequate supervisory review of incidents where officers use force that would correct patterns of unlawful actions by PPB officers in a timely or effective fashion, and rarely categorizes such unlawful seizures as out of policy even when the

force is clearly excessive or when the arrest was without sufficient legal justification. Defendant John Doe 1 received inadequate training, supervision, and/or discipline for violating the U.S. Constitution. Defendant City of Portland has effectively condoned this practice by repeatedly failing to correct constitutional violations by officers throughout the PPB.

58. Defendants City of Portland and John Does 2-10 failed to train and discipline its officers, including Defendant John Doe 1, to follow the protections against these types of police and government repression and retaliation that have been recognized under the U.S. Constitution, as described above. As a result, Defendant John Doe 1 engaged in unconstitutional conduct that resulted in harm to Plaintiff.

59. The unreasonable seizure of Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and injuries to his neck and back. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

**Claim 3: First Amendment — Unlawful Retaliation Against Speech — Individual Liability (42 U.S.C. § 1983)**

60. As described above, Defendants targeted Plaintiff for injury not because they had probable cause, but because they took offense to Plaintiff's speech activity.

61. The First Amendment protects persons from unlawful curtailment of expressive conduct, assembly, and associations with one another.

62. Defendant John Does 1-10's retaliatory motive was the but-for cause of Plaintiff's injuries. By hitting and injuring Plaintiff, Defendants chilled Plaintiff's political speech, violating his First Amendment rights.

63. The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and injuries to his neck and

back. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

### Claim 4: First Amendment – Unlawful Pattern and Practice – Municipal Liability
### (42 U.S.C. § 1983)

64.     As explained in Claim 3, Defendants John Does 1-10 violated Plaintiff's constitutional speech rights.

65.     Defendants John Does 1-10's conduct, and the conduct alleged in paragraphs 7-48, is illustrative of a pattern and practice of PPB officers violating the First Amendment rights of individuals at protest demonstrations against police misconduct. Defendant City of Portland has a custom and practice of using militarized force against left-wing or antifascist protestors. Defendants' past Fourth and First Amendment violations were intended to punish a group of protestors *en masse* for their political speech. Defendant City of Portland does not use such tactics against right-wing protestors or fascist protestors, such as the Proud Boys or Patriot Prayer, despite their disobedience of officers' orders and clear intent to terrorize the community of Portlanders.

66.     The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and injuries to his neck and back. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

### REASONABLE ATTORNEY'S FEES AND COSTS

67.     42 U.S.C. § 1988(b) allows "the prevailing party… a reasonable attorney's fee as part of the costs…" in an action brought under 42 U.S.C. § 1983.

68.     Plaintiff requests that the Court grant a reasonable attorney's fee in this action.

///

## CONCLUSION

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

    A.    For economic and non-economic damages in an amount to be determined at trial;

    B.    For reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988; and

    C.    Such other relief as the court deems just and proper.

DATED: August 4, 2022

*/s/ Jonathan Gersten*
Jonathan Gersten, OSB #191582
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*

*/s/ Juan C. Chavez*
Juan C. Chavez, OSB #136428
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*

*/s/ Franz Bruggemeier*
Franz Bruggemeier, OSB #163533
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*

*/s/ Alex Meggitt*
Alex Meggitt, OSB #174131
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*